## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

VINCIENT JONES and ALRICK POWELL                                    PLAINTIFFS

v.                                        Case No. 4:16-cv-00644-KGB

IPAWN RODNEY PARHAM, LLC;
IPAWN BASELINE, LLC; IPAWN
ARKANSAS, INC.; STEVEN LANDERS JR.                                  DEFENDANTS

## OPINION AND ORDER

Before the Court is defendants iPawn Rodney Parham, LLC ("iPawn Rodney Parham"),

iPawn Baseline, LLC ("iPawn Baseline"), iPawn Arkansas, Inc. ("iPawn Arkansas"), and Steve

Landers Jr.'s motion for summary judgment (Dkt. No. 44). Plaintiffs Vincient Jones and Alrick

Powell responded in opposition (Dkt. No. 53), and defendants replied (Dkt. No. 57). Defendants

also filed two supplemental filings in support of their motion for summary judgment (Dkt. Nos.

66, 69). The Court concludes that there are disputed genuine issues of material fact with respect

to all the claims brought by plaintiffs. The Court therefore denies defendants' motion for summary

judgment (Dkt. No. 44).

### I.      Overview

In their operative third amended complaint, plaintiffs assert the following claims: (1)

defendants charged usurious rates of interest in violation of Amendment 89, § 3 of the Arkansas

Constitution; (2) defendants charged usurious rates of interest in violation of the Arkansas

Deceptive Trade Practices Act ("ADTPA"), Arkansas Code Annotated § 4-88-101, *et seq.*; (3)

defendants made false statements on the face of their pawn loan contracts in violation of the

ADTPA; (4) defendants charged usurious rates of interest in violation of Arkansas Code Annotated

§ 4-57-105; (5) iPawn Rodney Parham failed to identify creditors on the face of its pawn loan

contracts in violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1638(a)(1), and its implementing regulations ("Regulation Z"); and (6) defendant iPawn Baseline failed to identify creditors on the face of its pawn loan contracts in violation of the TILA and its implementing regulations (Dkt. No. 33). For relief, plaintiffs seek injunctive, declaratory, and monetary relief.

## II.    Background

This action was commenced on June 20, 2016, in the Circuit Court of Pulaski County, Arkansas (Dkt. No. 54, at 1). Mr. Jones was the sole plaintiff (*Id.*). The original complaint was amended on August 31, 2016, to allege a TILA violation, and the case was then removed to this Court on September 6, 2016 (*Id.*). After removal, a second amended complaint was filed on September 5, 2017, adding Mr. Powell as a plaintiff (*Id.*). The third amended complaint was filed on February 22, 2018, in which the class definition was altered (*Id.*, at 1-2). Plaintiffs filed a motion to certify class on January 26, 2018 (Dkt. No. 29). The Court denied the motion to certify class (Dkt. No. 71).

Mr. Jones is a resident of Pulaski County, Arkansas, who pawned three items with iPawn Arkansas (Dkt. No. 54, at 3). The name of "iPawn Arkansas, Inc." is shown on each of Mr. Jones' pawn tickets (*Id.*). Mr. Jones has admitted that each of his pawn tickets states the name "iPawn Arkansas, Inc." at the top of the pawn ticket (*Id.*). Mr. Jones admits that he did not read his pawn tickets in their entirety (*Id.*, at 4). Mr. Jones admits that he is not aware of the TILA (*Id.*). Mr. Jones did not understand what the phrase "annual percentage rate" meant (*Id.*). Mr. Jones is also unable to explain how he was harmed by the tickets not having either "iPawn Rodney Parham, LLC" or "iPawn Baseline, LLC" on them (*Id.*). Mr. Jones did not pay a finance charge (*Id.*).

Mr. Powell is currently in the Faulkner County, Arkansas, jail awaiting trial on felony charges (*Id.*, at 5). Mr. Powell's detention is indefinite (*Id.*). He is a felon who was convicted of

conspiracy to commit capital murder and drug possession (*Id*.). Mr. Powell entered into two pawn transactions with iPawn Arkansas that are the subject of this action (*Id*., at 6). Mr. Powell did not redeem the items that he pawned (*Id*.). Mr. Powell further admits that he did not pay any interest (*Id*.). Mr. Powell also concedes that he did not pay a finance charge (*Id*.). Mr. Powell admits that at the top of each of his pawn tickets is the statement "iPawn Arkansas, Inc." (*Id*.). Mr. Powell thought he did business with iPawn Baseline because he was at the Baseline location (*Id*.). This was the only reason he thought he did business with iPawn Baseline (*Id*.). Mr. Powell admits that he has not been harmed by iPawn Baseline's name not appearing on his pawn tickets (*Id*., at 7). Further, Mr. Powell has never met Steven Landers, Jr. (*Id*.).

In a pawn transaction, a customer will present an item of personal property to the pawn shop (*Id*.). The customer and pawnshop will negotiate the value of the personal property that the customer seeks to pawn (*Id*.). iPawn Arkansas' customers sign a pawn ticket, which, among other things, contains the required TILA disclosures (*Id*., at 9). iPawn Arkansas uses a standard form pawn ticket that it purchases from an out of state vendor (*Id*.). The exhibits attached to the third amended complaint are examples of the form of pawn ticket that iPawn Arkansas purchases from an out-of-state printing company (*Id*.). Steven Landers, Jr. is the president and sole shareholder of iPawn Arkansas (*Id*., at 12). iPawn Arkansas is the sole member of iPawn Rodney Parham and iPawn Baseline (*Id*.).

In support of their motion for summary judgment, defendants present the affidavit of Michael Willingham, the Vice President and Chief Operating Officer of iPawn Arkansas (Dkt. No. 44-1). Mr. Willingham avers that he has been employed by iPawn Arkansas since March 2011 and that he is familiar with the pawn business in general and the operation of iPawn Arkansas in particular (*Id*., ¶ 2-3). Mr. Willingham states that a pawn transaction at iPawn Arkansas

commences when a customer enters the store and presents an item of personal property to an employee for the purpose of pawning it (*Id.*, ¶ 4). At that point, according to Mr. Willingham, the customer and pawn shop negotiate the value of the item of property, and if the customer and the pawn shop agree to a price, the customer is given cash for the merchandise (*Id.*, ¶ 5).

Mr. Willingham asserts that, at the time the item is exchanged for the agreed-upon price, "the transaction is concluded and the customer has no obligation to the pawn shop." (*Id.*). He also states that "[a] pawn customer is never in debt to iPawn Arkansas, Inc." and that "[o]nce the customer receives the cash from iPawn Arkansas, Inc., he or she has no obligation to iPawn Arkansas, Inc." (*Id.*, ¶ 6). Mr. Willingham notes that "the customer may, at his or her option, redeem the pawned property for a cash price which is stated on the pawn ticket." (*Id.*, ¶ 7). He states that "[t]he customer has no obligation to redeem the property which is pawned," though "[a] significant percentage of customers extend the redemption period for a fee." (*Id.*, ¶ 8). The redemption rate at iPawn Arkansas averaged 56% in 2015, 66% in 2016, and 59% in 2017 (*Id.*, ¶ 9). In the event "the property is not redeemed during the redemption period, or an extension of the redemption period, the merchandise is placed in the pawn shop's inventory for sale to the public." (*Id.*, ¶ 8).

Mr. Willingham states that, at iPawn Arkansas, "there is no such thing as a standard pawn transaction." (*Id.*, ¶ 10). He notes that "[w]hile the methodology for each transaction is similar, each transaction widely varies." (*Id.*). He further notes that "[t]he items offered for pawn vary significantly" and that "[a]lmost any item of personal property one can own may be pawned." (*Id.*). Mr. Willingham states that iPawn Arkansas "charges each customer a pawn service charge." (*Id.*, ¶ 13). The pawn service charge is an amount associated with the pawn of the item "and includes research as to the valuation of the merchandise, cost of holding the merchandise, insurance on the

merchandise," and other costs (*Id.*). The amount of the pawn service charge is shown on each pawn ticket in the box labeled "Finance Charge." (*Id.*, ¶ 14).

Mr. Willingham's affidavit also discusses the form of the pawn tickets. According to him, "[t]he pawn tickets used by iPawn Arkansas, Inc. are ordered from a printing company who prints forms for use by pawnbrokers throughout the United States," and "[o]ther than name, address, and company logo, the forms are standard to the State of Arkansas." (*Id.*, ¶ 15). Furthermore, since June 2016, "all pawn tickets of iPawn Arkansas, Inc. have contained an arbitration clause." (*Id.*, ¶ 16).

Mr. Willingham also states that iPawn Arkansas is the only entity sued in this litigation that is in the pawn business; according to him, "[n]either iPawn Rodney Parham, LLC or iPawn Baseline, LLC operate a pawn business." (*Id.*, ¶ 17). He further states that iPawn Arkansas conducted its pawn business "at two locations, one located on Rodney Parham Road in Little Rock Arkansas, and one on Baseline Road in Little Rock, Arkansas (*Id.*, ¶ 18). He avers that "iPawn Rodney Parham, LLC was formed on November 12, 2015, and iPawn Baseline, LLC was formed on October 6, 2015" and that "[t]hose LLCs were formed to enter into leases with the owner of the realty on which each of the iPawn Arkansas, Inc. stores were located." (*Id.*). According to him, neither of these entities are engaged in the pawn business (*Id.*). Mr. Willingham also testified at a deposition in this litigation (Dkt. No. 53-28). He testified that iPawn intends to make a profit on its transactions (*Id.*, at 4-5). Mr. Willingham stated that iPawn makes profit through the "sale of merchandise" or by making a profit "on the pawn service charge." (*Id.*, at 5). In Mr. Willingham's deposition, he testified that, if pawn customers "choose to extend it out for 30 days, we make a profit on the pawn service charge." (*Id.*, at 5).

Mr. Landers also provides an affidavit in support of the motion for summary judgment (Dkt. No. 44-5). Mr. Landers avers that he is "the sole shareholder [] of iPawn Arkansas, Inc." and that "[i]Pawn Arkansas, Inc. is the sole member of iPawn Rodney Parham, LLC, and iPawn Baseline, LLC." (*Id.*, ¶ 2). He also avers that iPawn Arkansas is engaged in pawn business at "1108 N. Rodney Parham Rd[.], Little Rock, Arkansas 72212" and at "6115 Baseline Rd., Little Rock, Arkansas, 72209." (*Id.*, ¶ 3). He notes that the Baseline Road location has closed (*Id.*). He states that neither iPawn Rodney Parham nor iPawn Baseline have been, or are, engaged in the pawn business (*Id.*, ¶ 4). Further, he states that he is not involved in the day-to-day management of iPawn Arkansas, and he affirms that he neither has an office at iPawn Arkansas or "regularly visit[s] the pawn stores." (*Id.*, ¶ 5). Finally, he avers that he did not participate in any pawn transactions with Mr. Jones or Mr. Powell and that he did not set the rate of interest, the finance charge, or the language contained in the pawn tickets used by iPawn Arkansas (*Id.*, ¶¶ 6-10).

Defendants also present the expert report of Robert T. Gammill in support of their motion for summary judgment (Dkt. No. 44-2). According to his report, Mr. Gammill is a bank consultant at DD&F Consulting Group working in the areas of regulatory intervention, mergers and acquisitions, bank recapitalizations, acquisitions of failed banks, strategic planning, and board training (*Id.*, at 3). Counsel for defendants retained Mr. Gammill "to examine the distinctions, if any, between a traditional or typical loan and a pawn transaction." (*Id.*). Mr. Gammill's opinion is based on his "experience and [his] review of documents set forth in Appendix A [of his report] as well as observations [he] made at iPawn's location on Rodney Parham." (*Id.*, at 3-4). Furthermore, his opinion "is based on [his] 40 plus years of experience in managing and advising community banks . . . ." (*Id.*). Mr. Gammill's report is dated November 30, 2017 (*Id.*, at 2). In his report, Mr. Gammill finds that "there are significant differences between a 'loan' and a

'pawn.'" (*Id.*, at 5). Mr. Gammill's report includes, among other things, a chart comparing bank loans with pawn transactions (*Id.*, at 6). According to this chart, bank loans and pawn transactions differ in six different respects: loan size, loan term, requirement to be repaid, credit checks, credit reporting, and pawn charge versus interest (*Id.*).

The record evidence also includes the defense expert report of David Johns, whose "opinions are based on [his] experience in the pawn industry and [his] visits to the iPawn stores over past years." (Dkt. No. 53-29, at 2). Mr. Johns avers that "there is very little in common between each transaction, other than the reference to these transactions as 'pawns.'" (*Id.*). Mr. Johns further states that "[t]he typical pawn at iPawn is written for a thirty day period with availability to the individual who requests the pawn to extend it beyond thirty days if their particular need dictates." (*Id.*). He also states that "[t]he amount of a pawn is not predictable, as the amount extended a customer depends on need and the value of the merchandise offered by the customer as collateral for the pawn." (*Id.*). He opines that the "difference between the value of merchandise offered for pawn collateral and the amount requested by the customer for the pawn is the subject of negotiation between iPawn and customers" and that "[m]erchandise offered as collateral for a pawn varies significantly," ranging from "appliances to jewelry, to electronics, to guns, and can include almost any type of personal property a customer might possess." (*Id.*, at 3). Thus, he opines that "no two pawn transactions are alike." (*Id.*).

Mr. Jones was deposed in this case. He states that he has done business with pawn shops for "probably about seven or eight years . . . ." (Dkt. No. 44-3, at 2). He further states that he went back to pawn shops to pick up his merchandise (*Id.*, at 3-4). Mr. Jones states that he picked up merchandise at iPawn's Rodney Parham location (*Id.*, at 4). Mr. Jones states that, after this lawsuit was filed, he went to the iPawn Rodney Parham location and retrieved his items (*Id.*). He notes

that he did not have to pay a fee (*Id*., at 4-5). Mr. Jones also testifies that he has "twice" gone back and obtained an extension on his merchandise from iPawn (*Id*., at 5). In response to a question as to whether he was "not obligated to get [his] stuff back," Mr. Jones answered, "I guess you can say that." (*Id*., at 7). Mr. Jones further testified that there have been occasions when he pawned an item at an iPawn location and his property was sold (*Id*., at 53-20, at 11). Mr. Jones testified that, as to his property, "[m]y intentions were to go back and get it, and the money wasn't right, so I wasn't able to go back and get it." (*Id*.).

Attached as exhibits to Mr. Jones' deposition are five pawn tickets (Dkt. No. 44-3, at 22-27). The first pawn ticket is for a pawn transaction on December 5, 2015, involving a "Boss BV93648 CD Player" (*Id*., at 22). This pawn ticket has Mr. Jones' name and personal information on it (*Id*.). The "amount financed" is $100.00, the "finance charge" is $25.00, the "total of payments" is $125.00, and the annual percentage rate is listed as 300.00% (*Id*.).

Mr. Jones also pawned a weed trimmer, which is recorded on pawn ticket number 116589 (*Id*., at 11, 25). The pawn ticket for this transaction states that the merchandise being pawned was a "Homelite UT3 String Trimmer." (*Id*., at 23). The "amount financed" is $40.00, the "finance charge" is $10.00, the "total of payments" is $50.00, and the listed annual percentage rate is 300.00% (*Id*., at 23).

The third pawn ticket attached to Mr. Jones' deposition is for a "Car Ster[e]o Power Acoustik . . . ." (*Id*., at 24). This is pawn ticket number 116741 (*Id*., at 10, 24). In this transaction, which occurred on June 20, 2016, the amount financed was "$15.00" and the finance charge was "$3.75," with a total of payments indicated as "$18.75" on the pawn ticket (*Id*., at 24). The pawn ticket for this transaction includes an arbitration clause (*Id*.).

Pawn tickets 116589 and 116741 have the phrase "iPawn Arkansas, Inc." in the header, followed by "11108 N. Rodney Parham Rd." (*Id.*, at 23-24). Pawn ticket # 107937 says "iPawn Arkansas, Inc. #2" in the header, followed by "6115 Baseline Rd." (*Id.*, at 22). Each of these pawn tickets also contain the following language:

> You are giving a security interest in the following pledged goods.
>
> . . .
>
> See the remainder of this contract for any additional information concerning nonpayment and default and prepayment refunds or penalties.
>
> . . .
>
> The undersigned Pledgor agrees that the term of this loan shall be for the period set forth herein and that at the end of such period, all charges due on this loan shall be paid in full.
>
> . . .
>
> I also understand and acknowledge that I am giving a security interest in the pledged goods.

(*Id.*, at 22-24).

Also attached to Mr. Jones' deposition are two separate pawn tickets, though these take a different form from the three discussed above (*Id.*, at 25). Mr. Jones states that he received these pawn tickets when he received his stereo and weed trimmer back from the pawnshop (*Id.*, at 16). Both pawn tickets are dated July 11, 2016, and Mr. Jones testified that he initialed both (*Id.*, at 13). Both pawn tickets also state "ACCOUNT PAID IN FULL." (*Id.*, at 25). At the top of each of these pawn tickets is the title "IPAWN ARKANSAS, INC.," followed by "11108 N. Rodney Parham Rd." (*Id.*). Defendants also present a check from iPawn Arkansas to Mr. Jones in the amount of $36.25 (*Id.*, at 26-27). Mr. Jones concedes that his signature is on the back of this check (*Id.*, at 13, 27). Mr. Jones stated, "I don't know what [the check] was for." (*Id.*, at 14).

Mr. Powell was deposed in this matter. In his own words, Mr. Powell described a pawn transaction as one where "[y]ou pledge property for a loan" and "[y]ou lose your property" if you do not pay the money back (Dkt. No. 44-4, at 9). Attached to Mr. Powell's deposition are two pawn tickets (*Id.*, at 19-20). The first pawn ticket, which is number 108913, lists three items: a "Actron CP9175 Orang Tool," a "Kenwood KDC—1028 Blk Stereo," and a "Logic CPX420 Silver Amplifier." (*Id.*, at 19). The amount financed on this pawn ticket is $40.00, the finance charge is $10.00, the total of payments is $50.00, and the annual percentage rate is noted as 300.00% (*Id.*). At the top of the pawn ticket is the title "iPawn Arkansas, Inc." immediately followed by the address "6115 Baseline Rd." (*Id.*). Mr. Powell testified that he was not able to go back and redeem this merchandise (*Id.*, at 11). He also testified that he read the pawn ticket to the extent it listed the finance charge and the annual percentage rate (*Id.*). He also confirmed that he signed this pawn ticket (*Id.*, at 10). Mr. Powell further testified that he "thought" he was doing business with iPawn Baseline "[b]ecause that's where I was at." (*Id.*, at 13). Mr. Powell testified that he "wasn't able to" redeem this merchandise (Dkt. No. 53-24, at 10).

The second pawn ticket for Mr. Powell—number 112532—is for a "Poulan 3450 Green Chainsaw" and a "Champion 42432 Yellow Tool." (Dkt. No. 44-4, at 20). The amount financed on this pawn ticket is $115.00, the finance charge is $28.75, the total of payments is $143.75, and the annual percentage rate is 300.00% (*Id.*). The title and address also reference iPawn Arkansas and the Baseline Road location (*Id.*, at 20). Mr. Powell testified that he signed this pawn ticket (*Id.*, at 12).

Both pawn tickets attributable to Mr. Powell contain the following language:

You are giving a security interest in the following pledged goods.

. . .

See the remainder of this contract for any additional information concerning nonpayment and default and prepayment refunds or penalties.

. . .

The undersigned Pledgor agrees that the term of this loan shall be for the period set forth herein and that at the end of such period, all charges due on this loan shall be paid in full.

. . .

I also understand and acknowledge that I am giving a security interest in the pledged goods.

(*Id*., at 19-20).

Mr. Powell testified that he "lost a ODB2 diagnostic scanner" to iPawn, though it is unclear to which item he is referring (*Id*., at 9). Mr. Powell also testified that he received "an extension on both [pawn tickets]." (*Id*., at 16). He could not recall what he paid for the extensions (*Id*., at 17). Mr. Powell also noted that he did not pay the finance charge (*Id*., at 18). In response to a question regarding the amount of interest he paid, Mr. Powell testified that he was not aware of any interest he paid (*Id*., at 17). Finally, Mr. Powell testified that he had never met Mr. Landers (*Id*., at 14).

Plaintiffs present multiple screenshots from the website "http://www.ipawnarkansas.com." (Dkt. Nos. 53-6, 53-7). These screenshots include the following language: "iPawn provides quick and easy loans to customers;" "Getting a loan with iPawn will never hurt your credit;" "[W]ith iPawn, you can extend Your Loan Period Without Penalty;" and "iPawn has no minimum or maximum loan periods." (Dkt. No. 53-6, at 2). Another screenshot from the same website says: "[I]f you find yourself in need of a short-term loan and the traditional loan process is not an option, contact an iPawn representative . . . ." (Dkt. No. 53-7, at 2). A separate screenshot says, "At iPawn, you use the items you already own to obtain a short-term loan to meet you[r] financial needs. Once

you pay back your loan, you can pick up your item(s)." (*Id.*, at 3). A screenshot from iPawn Arkansas' facebook page shows a photo with "iPawn" and the phrase "We Do Loans!" (Dkt. No. 53-9, at 2). Finally, plaintiffs also present a screenshot of iPawn Arkansas' LinkedIn page, which contains the following statement: "[I]f you find yourself in need of a short-term loan and the traditional loan process is not an option, contact an iPawn representative . . . ." (Dkt. No. 53-10, at 2).

Plaintiffs present the articles of incorporation of iPawn Arkansas to rebut defendants' arguments for summary judgment (Dkt. No. 53-3, at 2). The articles of incorporation state that the "nature of the business of the corporation and the object or purposes proposed to be transacted, promoted or carried out by it, are as follows: (a) Provide collateral based loans for customers[.]" (*Id.*). Plaintiffs also present a lease between iPawn Baseline and Green, Bunn, Herrington, LLC, for a property located at 6115 Baseline Road, Little Rock, Arkansas (Dkt. No. 53-14, at 2). According to this document, "[t]he Premises shall be used for the operation of a business providing for pawn and loan services to consumers, as well as the retail sale of goods." (*Id.*). The lease was signed by Mr. Landers on behalf of iPawn Baseline (*Id.*, at 9). A lease for the 11108 North Rodney Parham Road, Little Rock, Arkansas, location is also included in the record (Dkt. No. 53-15). This lease is between iPawn Rodney Parham and Leonard R. Ellis Properties, Inc., and it states that "[t]he Premises shall be used for the operation of a business providing for pawn and loan services to consumers, as well as the retail sale of goods." (*Id.*, at 2).

The operating agreements for iPawn Baseline and iPawn Rodney Parham are also in the record (Dkt. Nos. 53-18, 53-19). The operating agreements indicate that iPawn Baseline and iPawn Rodney Parham are entirely owned by iPawn Arkansas (Dkt. Nos. 53-18, at 10; 53-19, at 10). Both operating agreements state that "[t]he Company is organized to provide centralized

management of business activities and investments." (Dkt. Nos. 53-18, at 7; 53-19, at 7). Both operating agreements are signed by Mr. Landers (Dkt. Nos. 53-18, at 38; 53-19 at 38).

### III. Discussion

Defendants move for summary judgment on each of plaintiffs' six claims (Dkt. No. 44). Defendants argue that they are entitled to summary judgment for the following reasons: (1) the TILA claims must fail because iPawn Rodney Parham and iPawn Baseline are not in the pawn business, plaintiffs cannot demonstrate reliance, and plaintiffs have not been harmed; (2) the usury and ADTPA claims must fail because the undisputed facts show that plaintiffs did not pay a usurious rate of interest; (3) the usury claims must fail because the pawn transactions were not loans and interest was not charged or paid; (4) the ADTPA claims must fail because plaintiffs did not suffer actual damages; (5) the ADTPA claims must fail because the finance charge is not equivalent to interest; and (6) the claims against Mr. Landers in his individual capacity must fail (Dkt. No. 45, at 8-17).

Plaintiffs retort that summary judgment is inappropriate based upon the record evidence in this case. Specifically, plaintiffs make the following arguments: (1) summary judgment should be denied on the constitutional usury claims because the record evidence shows that defendants issued usurious loans; (2) the ADPTA claims should survive summary judgment because the record evidence shows that defendants' usurious practices violate the ADTPA, that plaintiffs sustained damages as a result, and that Mr. Landers is liable as a controlling person of iPawn Arkansas; (3) the usury claims against iPawn Rodney Parham and iPawn Baseline should be decided at trial because they are creditors on plaintiffs' pawn transactions; and (4) the TILA claims must be resolved at trial because plaintiffs seek declaratory relief and because iPawn Rodney Parham and iPawn Baseline failed to list themselves as creditors on plaintiffs' pawn tickets (Dkt.

No. 53, at 10-35). In reply, defendants argue that the TILA claims must fail because the record evidence demonstrates that neither iPawn Rodney Parham nor iPawn Baseline were engaged in pawn transactions and that plaintiffs did not suffer harm based upon the alleged TILA violations (Dkt. No. 57, at 3-4). Defendants also assert that plaintiffs have failed to present record evidence that the pawn transactions at issue are governed by Arkansas' usury provisions (*Id.*, at 5). Finally, defendants assert that plaintiffs have not demonstrated that they suffered material damages under ADTPA or that Mr. Landers is personally liable under the ADTPA (*Id.*, at 8-9).

### A. Standard Of Review

Summary judgment is proper if there is no genuine issue of material fact for trial. *UnitedHealth Group Incorporated v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56). Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial

burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Plaintiffs make four claims related to usury: (1) the interest rates on defendants' pawn transactions violate Amendment 89, § 3 of the Arkansas Constitution; (2) the interest rates on defendants' pawn transactions violate the ADTPA; (3) the statement on the pawn tickets that the finance charge "is not interest for any purpose of law" violates the ADTPA; and (4) the interest rates on defendants' pawn transactions violate Arkansas Code Annotated § 4-57-105 (Dkt. No. 33, at 16-17). The success of these claims hinges upon the question of whether the pawn transactions entered into by plaintiffs are "loans" charging usurious rates of interest under Arkansas law. The Court discusses each claim in turn below.

### B. Amendment 89 And Arkansas Code Annotated § 4-57-104

Amendment 89 of the Arkansas Constitution sets the "maximum lawful rate of interest on loans or contracts" at 17% per annum. Ark. Const. Amend. 89, § 3. "All contracts under Section 3 [of Amendment 89] having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest . . . ." Ark. Const. Amend. 89, § 6. Per Arkansas Code Annotated § 4-57-104, "[t]he parties to a contract may agree in writing to the payment of interest not exceeding the applicable rate of interest, if any, set forth in Arkansas Constitution, Amendment 89, on money due or to become due." The Arkansas Supreme Court has defined a loan as "a contract under which, in substance, one party transfers to the other money that the other party agrees to repay

15

absolutely, together with additional amounts as agreed for its use, *regardless of form*." *McGhee*, 289 S.W.3d at 25 (citation omitted) (emphasis added).[1]

In *Sparks v. Robinson*, 51 S.W. 460 (Ark. 1899), the Arkansas Supreme Court ruled that a pawn transaction was a loan charging usurious interest. In that case, plaintiff Robinson sold, with a right of redemption, a sewing machine to defendant Sparks for $8.00. 51 S.W. at 461. Robinson "reserve[d] the right to redeem [the sewing machine] by the 16th day of December, 1895, and to reimburse the price for said article." 51 S.W. at 461. "After that date, if said article [was] not redeemed, . . . Sparks, [would] become the absolute owner of the same, without default to [Robinson]." *Id*. The ticket of sale stated as follows:

> This is to certify that if the holder of this certificate presents the same at my office, at 105 East Markham street, not later than thirty days from date, he has the option of purchasing any one article of merchandise in my place of business that is for sale at a price not to exceed ten per cent[] above its actual cost, including one sewing machine, $8.00, if preferred. This offer will be void after thirty days from date.

*Id*. Further, the evidence indicated that Sparks "stored" the sewing machine on Robinson's behalf in exchange for 80 cents per month, "with the distinct understanding that it was not interest." *Id*. The Arkansas Supreme Court held that this transaction "was a loan of money at the rate of 10 per cent[] per month" and that the lower court "was clearly justified in concluding that the instrument purporting to be a bill of sale, although absolute on its face, was intended by the parties as nothing more than a security for the money advanced." *Id*.

Similarly, in *Sleeper v. Sweetser*, 446 S.W.2d 228 (Ark. 1969), the Arkansas Supreme Court held that a pawn transaction constituted a loan. In the transaction at issue, plaintiff Sweetser

---

[1] To the extent defendants argue that Amendment 89 has altered the definition of "loan" as applied to this litigation, the Court disagrees. Amendment 89 does not contain a definition for "loan or contracts" as those words are used in Section 3 of Amendment 89; rather, Amendment 89 defines "loan or financing transaction by or to a federally insured depository institution" and "loans made by or to governmental units." Ark. Amend. § 5(e)-(f).

exchanged a diamond ring for $50.00 from defendants. 446 S.W.2d at 229. A bill of sale and a "repurchase agreement" were completed, giving Sweetser "the right to repurchase the ring for $55 within ten days upon presentation of the written option." *Id*. Within that ten-day period, Sweetser gave defendants "a $5 check for the purpose of having the option extended for an additional ten days." *Id*. Sweetser argued that "$5 of the $55 repurchase price provided in the option to repurchase constituted a usurious rate of interest in that it amounts to 10% for ten days, or 1% per day . . . ." *Id*. The lower court agreed with Sweetser and found that this transaction was a usurious loan. *Id*. at 230. On appeal, defendants argued that the lower court erred because the bill of sale and repurchase agreement did not include any language "reflecting that the transaction between the parties was one of borrowing and lending of money . . . ." *Id*. Based upon defendants' failure to oppose Sweetser's assertion that the transaction was a loan with a usurious rate of interest, the Arkansas Supreme Court affirmed the holding of the lower court. *Id*. at 231.

The Arkansas Supreme Court has also held that check-cashing transactions, which are similar though not identical to pawn transactions, constitute loans. *See McGhee*, 289 S.W.3d at 25; *Luebbers v. Money Store, Inc.*, 40 S.W.3d 745 (Ark. 2001). At issue in *Luebbers* was whether the "Check-Casher's Act" violated Article 4 of the Arkansas Constitution. 40 S.W.3d at 746. The check-cashing transaction occurred as follows:

> [T]he agreement signed by Ms. Luebbers on September 3, 1999, shows that she wrote the Money Store a check for $400, and the Money Store paid her $350 cash in return. The $50 difference consisted of a $40 "check cashing fee" and a $10 "deferred presentment fee." In consideration for the deferred presentment fee, the Money Store expressly agreed to "hold your check and not present it to your bank for payment before 9/17." Additionally, the agreement stated that Ms. Luebbers had the right between September 3 and September 17 to repurchase her check from the Money Store by paying the face amount of the check ($400). In the event that she did so, the Money Store agreed to "deliver your check to you but you will not be entitled to a refund of any fees you already paid us." Finally, the agreement disclosed that the $50 in fees constituted an "annual percentage rate" of 372.45.

*Id.* at 746-47. It was undisputed by the parties that this transaction complied with the Check-Casher's Act. Noting that "[t]he mere fact that the contract has the form of a contingency will not exempt it from the scrutiny of the court," the Arkansas Supreme Court held that the Check-Casher's Act authorized transactions that are barred by Arkansas' constitutional prohibition against usury and that therefore the Check-Casher's Act was unconstitutional. *Id.* at 750. The Arkansas Supreme Court did not, however, directly decide the issue of whether check-cashing transactions authorized by the Check Casher's Act constituted loans. *Id.* at 750 n.4.

In *McGhee*, the Arkansas Supreme Court affirmatively found that check-cashing transactions authorized by the Check Casher's Act constituted loans. There, the Arkansas Supreme Court held that a check-cashing transaction "is a loan, as the check-casher is clearly loaning money to its customer for a fee with the expectation of repayment." 289 S.W.3d at 25. The Arkansas Supreme Court also held that the fee paid to the check-casher by the customer constituted interest because "that fee is in reality an amount owed to the lender in return for the use of borrowed money . . . ." *Id.* at 26. Further, the court noted that each check-cashing transaction included "the total amount of fees charged . . . expressed . . . *as an annual percentage* rate," and that the annual percentage rate is "[t]he actual cost of borrowing money, expressed in the form of an annualized *interest* rate." *Id.* (citing Ark. Code Ann. § 23-52-106(c) and *Black's Law Dictionary* 831 (8th ed. 2004)) (alterations in original). Accordingly, the Arkansas Supreme Court found that the check-cashing transactions authorized by the Check Casher's Act and the fees charged therein were bound by Arkansas' constitutional prohibition of usury.

The Court is also aware of *Arch Street Pawn Shop, LLC v. Gunn*, 531 S.W.3d 390 (Ark. 2017), a relatively recent decision by the Arkansas Supreme Court. There, the Arkansas Supreme Court decertified a class of pawn shop customers who alleged that a pawn shop violated Arkansas'

anti-usury prohibition. The Arkansas Supreme Court held that, under Arkansas Rule of Civil Procedure 23, the proposed class members were not ascertainable because "[d]etermining whether a particular pawn transaction was a loan and thus created a debt is the sort of predicate question that would have to be determined by reference to each potential class member's situation rather than a uniform set of objective criteria." 531 S.W.3d at 392. The court also noted that, while the proposed class members each received similarly worded pawn tickets, "some customers redeemed their pawned items, some surrendered their pledges intending to redeem them but ultimately did not, and still others pawned items with no intent to redeem them at all." *Id*. Accordingly, the court reversed the trial court's certification of a class because "the class defined is not ascertainable as a threshold matter . . . ."

The test for usury in Arkansas is not "whether the 'lender' intended to violate the usury laws, but whether the *lender* knowingly entered into a usurious contract intending to profit by the methods employed." *McElroy v. Grisham*, 810 S.W.2d 933, 936 (Ark. 1991) (emphasis added) (citing *Winkle v. Grand Nat'l Bank*, 601 S.W.2d 559 (Ark. 1980) and *Davidson v. Comm. Credit Equip. Cor.*, 499 S.W.2d 68 (Ark. 1973)). To determine the intent of the "lender," "the fact finder must look beyond the four corners of the challenged agreement 'to determine, considering all the attendant facts and circumstances, if the contract is usurious in effect.'" *Hickman v. Courtney*, 203 S.W.3d 632, 636 (Ark. 2005) (quoting *Carter v. Four Seasons Funding Corp.*, 97 S.W.3d 387 (Ark. 2003)); *see Sparks*, 51 S.W. at 462 ("The law shells the covering and extracts the kernel. Names amount to nothing, when they fail to designate the facts.").

In its decision denying the motion to certify class, this Court analyzed these precedents and determined that Arkansas law requires the Court to look beyond the face of the pawn tickets and examine the entirety of each pawn transaction to determine if those transactions were loans

charging usurious rates of interest (Dkt. No. 71). With respect to the proposed class members, the only record evidence before the Court regarding the alleged usurious transactions were the pawn tickets; based upon this evidence, the Court concluded that plaintiffs had failed to meet their burden of showing that there were questions of law and fact common to the proposed class members (*Id*.). Therefore, only the claims of Mr. Jones and Mr. Powell are before the Court. The Court next turns to examine whether defendants are entitled to summary judgment in their favor on plaintiffs' claims regarding the pawn transactions entered into by plaintiffs.

### 1. Mr. Jones

There is record evidence in the form of pawn tickets that Mr. Jones entered into three separate pawn transactions with defendants (Dkt. No. 44-3, at 22- 24). Pawn ticket 107937 shows that, on December 5, 2015, Mr. Jones pawned a "Boss BV93648 CD Player." (*Id*., at 22). The header of pawn ticket 107937 says, "iPawn Arkansas, Inc." and references the Baseline Road location (*Id*.). The amount financed on pawn ticket 107937 is $100.00, the finance charge is $25.00, the total of payments is $125.00, and the annual percentage rate is listed as 300.00% (*Id*.). Similarly, pawn ticket 116589 shows that Mr. Jones pawned a "Homelite UT3 String Trimmer" on June 13, 2016 (*Id*., at 23). The amount financed is $40.00, the finance charge is $10.00, the total of payments is $50.00, and the listed annual percentage rate is 300.00% (*Id*., at 23). The third pawn ticket attributed to Mr. Jones is pawn ticket 116741, which shows that Mr. Jones pawned a "Car Stereo Power Acoustik" at the Rodney Parham location on June 20, 2016 (*Id*., at 24). The amount financed on pawn ticket 116741 was $15.00 and the finance charge was $3.75, with a total of payments indicated as $18.75 on the pawn ticket (*Id*.). The annual percentage rate on pawn ticket 11674 is listed as "N/A," and this pawn ticket contains an arbitration clause (*Id*.). Each of these three pawn tickets contains the following language:

You are giving a security interest in the following pledged goods.

. . .

See the remainder of this contract for any additional information concerning nonpayment and default and prepayment refunds or penalties.

. . .

The undersigned Pledgor agrees that the term of this loan shall be for the period set forth herein and that at the end of such period, all charges due on this loan shall be paid in full.

. . .

I also understand and acknowledge that I am giving a security interest in the pledged goods.

(*Id.*, at 22-24).

Mr. Jones stated that, in the past, he had picked up his property from pawn shops (*Id.*, at 3-4). Mr. Jones testified that he had "twice" gone back and obtained an extension on his pawned merchandise with iPawn (*Id.*, at 5). Mr. Jones further testified that there have been occasions when he pawned an item at an iPawn location and his property was sold (*Id.*, at 53-20, at 11). Mr. Jones testified that, as to his property, "[m]y intentions were to go back and get it, and the money wasn't right, so I wasn't able to go back and get it." (*Id.*). Mr. Jones also testified that, after he filed this lawsuit, he went to the Rodney Parham location where he was returned his car stereo and trimmer (*Id.*, at 4). He stated that, on this occasion, he did not need to pay a fee for the return of his property (*Id.*). Mr. Jones testified that he received two pawn tickets when he was returned his items (*Id.*, at 12).

Based upon the record evidence, the Court concludes that there remain genuine issues of material fact as to whether defendants knowingly entered into loans charging usurious interest with Mr. Jones. First, certain aspects of the form of the transactions described by Mr. Jones resemble

the transactions described in *Sparks* and *McGhee*, both of which were ruled to be usurious loans. Briefly, in *Sparks*, plaintiff sold a sewing machine to defendant in exchange for $8.00 and a right of redemption. 51 S.W. at 461. The plaintiff had the right to repurchase the sewing machine for $8.00 plus 80 cents within a month. *Id*. In *McGhee*, the Arkansas Supreme Court held that transactions authorized under the Check Casher's act were loans. 289 S.W.3d at 25. As described in *Luebbers*, check-cashing transactions involve a borrower who provides a check to a lender in exchange for an amount of cash that is less than the face value of the check, and then the borrower has the option to repurchase the check for its face value. In short, the transactions in *Sparks* and *Luebbers*/*McGhee* involve a loan collateralized by either merchandise or check, and the Arkansas Supreme Court characterized the fees charged for repurchase or to extend the right to repurchase as interest.

Mr. Jones' three documented pawn transactions involve the same form: (1) he exchanged property for cash and a right to redeem the property for a fee, and (2) he had the right to extend the right to redeem the property for a fee. Furthermore, Mr. Jones testified that it was his intent to recover his property and that he was not able to do so because "the money wasn't right . . . ." (Dkt. No. 53-20, at 11). Additionally, the form of the pawn tickets attributable to Mr. Jones state that Mr. Jones is "giving a security interest" and "agrees that the term of this *loan* shall be for the period set forth herein . . . ." (Dkt. No. 44-3, at 22-24 (emphasis added)). Also, iPawn Arkansas' website and social media postings reference their willingness to make loans (Dkt. Nos. 53-6, 53-7, 53-9, 53-10). Finally, iPawn Arkansas' own articles of incorporation state that the "nature of the business of the corporation are . . . [to] [p]rovide collateral based loans for customers . . . ." (Dkt. No. 53-3, at 2). The "finance charge" on each of the pawn tickets is 25% of the "amount financed" and is due monthly, which means that the annual sum of the finance charges is 300% of the amount

financed.[2]  The Court also notes Mr. Gammill's opinion that these transactions do not qualify as loans based upon their size, term, repayment requirement, lack of credit checks, lack of credit reporting, and existence of a pawn service charge (Dkt. No. 44-2, at 6).  Viewing the evidence in the light most favorable to the non-movants, the Court concludes that the differences between traditional bank loans and pawn transactions identified by Mr. Gammill may not prevent the pawn transactions entered into by Mr. Jones from being classified as "loans" under Arkansas law. Further, the Court notes that in Mr. Johns' opinion, he refers to the merchandise provided by the customer as "collateral." (Dkt. No. 53-29, at 2-3).  Based upon the precedents discussed above, and based upon the record evidence before the Court with all reasonable inferences drawn in favor of plaintiffs, the Court concludes that there are genuine issues of material fact in dispute as to whether defendants knowingly entered into loans charging a usurious rate of interest with Mr. Jones.

### 2.      Mr. Powell

The Court also concludes that there are genuine issues of material fact in dispute as to whether defendants knowingly entered into loans charging a usurious rate of interest with Mr. Powell.  There are two pawn tickets in the record attributable to Mr. Powell:  pawn tickets 108913 and 112532 (Dkt. No. 44-4, at 19-20).  Pawn ticket 108913 is for three items, and the amount financed is $40.00, the finance charge is $10.00, the total of payments is $50.00, and the annual percentage rate is 300.00% (*Id*., at 19).  Pawn ticket 112532 is for one item, and the amount financed is $115.00, the finance charge is $28.75, the total of payments is $143.75, and the annual

---

[2]  Pawn ticket 1073937 is illustrative (Dkt. No. 44-3, at 22).  The amount financed is $100.00 and the finance charge is $25.00 (*Id*.).  The due date is one month after the transaction initially occurred (*Id*.).  If Mr. Jones pays $25.00 per month for a year in order to extend the redemption period, Mr. Jones will have paid a total of $300.00 on top of the $100.00 he must repay to redeem the pawned item (*Id*.).

percentage rate is 300.00% (*Id.*, at 20). Both pawn tickets contain the same language used in Mr. Jones' pawn tickets (*Id.*, at 19-20).

Mr. Powell describes pawn transactions as transactions where "[y]ou pledge property for a loan" and "[y]ou lose your property" if you do not pay the money back (*Id.*, at 9). Mr. Powell testified that he received "an extension on both" of his pawn tickets, though he does not recall what he paid for the extensions (*Id.*, at 16-17). Mr. Powell further testified that he "lost" an item to defendants, though it is not clear if this item is listed on either of the pawn tickets in the record attributable to Mr. Powell (*Id.*, at 9). Mr. Powell also testified that he was not able to redeem the merchandise listed in his two pawn tickets (*Id.*, at 10-11). Again, the Court also notes Mr. Gammill's opinion that these transactions do not qualify as loans based upon their size, term, repayment requirement, lack of credit checks, lack of credit reporting, and existence of a pawn service charge (Dkt. No. 44-2, at 6). Even with the benefit of Mr. Gammill's opinion, based upon the same precedents discussed in the preceding section, the form of the pawn transactions engaged in by Mr. Powell, Mr. Powell's understanding of pawn transactions, the language of the pawn tickets, the opinions of the two experts, and iPawn Arkansas' characterization of its services as "loans," the Court concludes that there are genuine issues of material fact in dispute as to whether defendants knowingly entered into loans charging a usurious rate of interest with Mr. Powell.

### 3. Damages

To the extent defendants argue that they are entitled to summary judgment on the claims under Amendment 89 and Arkansas Code Annotated § 4-57-104 because plaintiffs were not charged interest, the Court concludes that there are genuine issues of material fact in dispute on the question of whether defendants charged plaintiffs' interest or whether plaintiffs otherwise suffered damages as a result of the pawn transactions. Per Amendment 89 to the Arkansas

Constitution, "[a]ll contracts under Section 3 having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest . . . ." Ark. Const. Amend. 89, § 6(b). Arkansas courts have implied that the mere act of *charging* usurious interest creates a usurious contract. *Smith v. Eisen*, 245 S.W.3d 160, 172 (Ark. Ct. App. 2006) ("[I]f the lender alone *charges or receives* more than is lawful the contract is usurious.") (emphasis added). Furthermore, the Arkansas Supreme Court has held that, when collateral is repossessed by the lender on a usurious contract, the "correct measure of damages for loss of use of property . . . is the rental value or reasonable value of the use of the property." *Mowery v. House*, 355 S.W.2d 275, 277 (Ark. 1962) (finding that the trial court erred in calculating damages where the borrower's truck had been attached and held by the sheriff based upon nonpayment on a usurious contract) (citing *Arnold Barber Co. v. Provance*, 253 S.W.2d 367 (Ark. 1952)).

There is record evidence that Mr. Jones twice received from defendants an extension of time to redeem his merchandise (Dkt. No. 44-3, at 5). Additionally, there is record evidence that Mr. Powell received "an extension on both [pawn tickets]." (Dkt. No. 44-3, at 16). As discussed above, in analyzing similar transactions, the Arkansas Supreme Court in its prior decisions has characterized redemption and extension fees as interest. *See Sparks*, 51 S.W. at 461. To the extent defendants argue that the phrase "APR" on the pawn tickets does not refer to interest, the Arkansas Supreme Court may have foreclosed that argument. *See McGhee*, 289 S.W.3d at 26 ("'Annual percentage rate,' commonly referred to as an APR, is '[t]he actual cost of borrowing money, expressed in the form of an annualized interest rate.'") (citation omitted).

There is also record evidence that both Mr. Jones and Mr. Powell were unable to redeem their merchandise from defendants. Specifically, Mr. Powell testified that he "lost a ODB2 diagnostic scanner" to defendants, though it is not clear if this item is referenced in either of the

pawn tickets in the record attributable to him (*Id.*, at 9). Mr. Powell also testified that he was not able to redeem the merchandise described in pawn tickets 108913 and 112532 (Dkt. Nos. 44-4, at 9; 53-24, at 10). Viewed in the light most favorable to plaintiffs, the finance charge and extension fees paid by plaintiffs may be construed as interest. Furthermore, again viewing the record evidence in the light most favorable to plaintiffs, plaintiffs may have lost merchandise because of their defaults on the loans extended by defendants. Accordingly, there are genuine issues of material fact in dispute regarding whether plaintiffs were charged usurious interest or otherwise suffered damages in their pawn transactions with plaintiffs.

### C.     Usury Claims Under The ADTPA

The Court concludes that genuine issues of material fact remain in dispute regarding plaintiffs' claim that they were charged usurious rates of interest in violation of the ADTPA. The Arkansas Supreme Court has held that Arkansas Code Annotated § 4-88-107(a)(10) of the ADTPA "may be violated by charging usurious interest rates . . . ." *State ex rel. Bryant v. R & A Inv. Co., Inc.*, 985 S.W.2d 299, 296-97 (Ark. 1999); *see Antoon v. Securus Tech., Inc.*, Case No. 5:17-cv-5008, 2017 WL 2124466 (W.D. Ark. May 15, 2017). Defendants have cited the Court to no authority that indicates that the usury analysis under the ADTPA differs from the usury analysis under Amendment 89 or Arkansas Code Annotated § 4-57-104. Accordingly, for the reasons discussed in the preceding section, the Court concludes that genuine issues of material fact remain in dispute regarding whether defendants violated the ADTPA by charging plaintiffs usurious rates of interest.

Defendants also assert that plaintiffs' ADTPA usury claims must fail because plaintiffs did not suffer actual damages (Dkt. No. 45, at 13-14). The ADTPA limits private rights of action to

those persons who suffer "an actual financial loss as a result of his or her reliance[3] on the use of a practice declared unlawful by this chapter . . . ." Ark. Code Ann. § 4-88-113(f)(1)(A).  The Arkansas Supreme Court examined this issue in *Wallis v. Ford Motor Company*, 208 S.W.3d 317, 328 (Ark. 2005).  In *Wallis*, the plaintiff attempted to certify a class of Ford Explorer owners and lessees on the basis that the Explorers' value had diminished because of a dangerous design defect. 208 S.W.3d at 318.  The *Wallis* Court held that actual damages exist "when the product has actually malfunctioned or the defect has manifested itself."  208 S.W.3d at 328.  The *Wallis* Court concluded that a private cause of action under the ADTPA was not cognizable "[w]here the only alleged injury is the diminution in value of the product . . . ."  *Id*.  In *M.S. Wholesale Plumbing, Inc. v. University Sports Publications Co.*, however, the court concluded that paying for a product that was "not at all what [defendant] represented" alleged sufficient facts to satisfy the ADTPA's actual damage element.  No. 4:07-cv-00730-SWW, 2008 WL 90022, at *4 (E.D. Ark. Jan. 7, 2008).

These precedents are factually distinct from the present case, where the record evidence indicates that Mr. Powell was not able to redeem the merchandise referenced in pawn tickets 108913 and 112523 (Dkt. Nos. 44-4, at 11; 53-24, at 10).  The record evidence also shows that Mr. Powell received an extension on both of these pawn tickets, though it is unclear if he paid a fee for the extensions (Dkt. No. 44-4, at 16).  The record evidence also shows that Mr. Jones "twice" went back and obtained an extension on his pawned merchandise with iPawn, though it is unclear if the referenced extensions relate to any of the pawn tickets attributable to Mr. Jones in the record (Dkt. No. 44-3, at 5).  Furthermore, there is record evidence that Mr. Jones pawned an

---

[3] Neither party has briefed the issue of reliance under the ADTPA.  *See Apex Oil Co. Inc. v. Jones Stephens Corp.*, 881 F.3d 658, 662-63 (8th Cir. 2018) (finding that reliance is an element of a claim under the ADTPA).

item at an iPawn location and that his property was sold (*Id.*, at 53-20, at 11). Viewing the record evidence in the light most favorable to plaintiffs, the record evidence indicates that there are genuine issues of material fact in dispute as to whether plaintiffs engaged in pawn transactions that were loans charging usurious rates of interest and that plaintiffs were charged interest and lost their property to defendants. Accordingly, the Court concludes that there are genuine issues of material fact in dispute as to whether plaintiffs suffered "actual damages" as that phrase is defined by the ADTPA. Accordingly, the Court denies defendants' motion for summary judgment on this basis on plaintiffs' usury claim under the ADTPA.

### D. False Statement Claim Under The ADTPA

Defendants argue that they are entitled to summary judgment on plaintiffs' third claim, which is brought pursuant to the ADTPA. In that claim, plaintiffs allege that the statement on the pawn tickets that the finance charge "is not interest for any purpose of law" violates the ADTPA (Dkt. No. 33, ¶¶ 107-110). Defendants argue that plaintiffs have not suffered any "actual damages" under the ADTPA and that "[a] finance charge is not interest." (Dkt. No. 45, at 14).

The Court disagrees that defendants are entitled to summary judgment based on either of these arguments. In short, these arguments recycle arguments made by defendants against plaintiffs' usury claims. As to the argument that plaintiffs have not suffered any "actual damages," the Court finds that there are genuine issues of material fact in dispute regarding whether plaintiffs engaged in pawn transactions that were disguised loans charging usurious rates of interest and suffered actual damages as a result. Furthermore, as discussed earlier, there are genuine issues of material fact in dispute as to whether the finance charge at issue qualifies as interest on a loan under Arkansas constitutional and statutory law. For these reasons, the Court denies defendants' motion for summary judgment on plaintiffs' false statement claim under the ADTPA.

### E.      Steve Landers' Alleged Liability

Defendants argue that summary judgment is appropriate on plaintiffs' claims against Mr. Landers in his individual capacity because he is a passive investor in the other defendants (Dkt. No. 45, at 14-16).  They argue that the undisputed material facts show that Mr. Landers does not exercise day-to-day control over the other defendants, that he does not participate in pawn transactions, that he rarely visits the pawn shops, and that he did not set the alleged rates of interest charged to plaintiffs (Dkt. No. 45, at 15).  Defendants assert that Mr. Landers is shielded from personal liability by the corporate form of iPawn Arkansas, for which he is the sole shareholder (*Id*.).  Plaintiffs respond by citing to Arkansas Code Annotated § 4-88-113(d)(1) and *Roggasch v. Sims*, 481 S.W.3d 440, 447 (Ark. Ct. App. 2016) (Dkt. No. 53, at 27).  Plaintiffs argue that these authorities stand for the proposition that Mr. Landers may be held liable for any violations of the ADTPA committed by the corporations he directly or indirectly controls (*Id*.).

The Court concludes that there are genuine issues of material fact in dispute as to whether Mr. Landers may be held liable for the claims alleged against the other defendants.  The ADTPA provides that "[e]very person who directly or indirectly controls another person who is in violation of or liable under [the ADTPA] shall be jointly and severally liable . . . , provided that the person . . . knew or reasonably should have known of the existence of the facts by reason of which the violation or liability exists."  Ark. Code Ann. § 4-88-113(d)(1).  Furthermore, while "shareholders are not ordinarily liable for the acts of their corporation or LLC," "shareholders and employees may be liable for their own acts or conduct."  *Scott v. Cent. Ark. Nursing Ctrs., Inc.*, 278 S.W.3d 587, 595-96 (Ark. Ct. App. 2008) (citations omitted) (involving claims for wrongful death, negligence, breach of contract, and violation of the Arkansas Long Term Care Residents' Rights statute, Ark. Code Ann. § 20-10-1204).  In *Scott*, the appellate court affirmed the circuit court's

decision to grant a directed verdict in a shareholder's favor where there was no evidence that the shareholder's own conduct led directly to plaintiff's damages. 278 S.W.3d at 596 (examining Ark. Code Ann. § 4-27-622(b)). In contrast, in *Roggasch v. Sims*, an appellate court found that the president of a corporation could be held individually liable under the ADTPA as an officer of the corporation. 481 S.W.3d at 446-47. In *Roggasch*, the court acknowledged elsewhere in its decision that there was substantial evidence that the president "made certain representations about his age, education, experience, and insurance coverage that were false" and that "[t]here was sufficient evidence for the jury to reasonably conclude that the appellants' failure to speak truthfully caused the [plaintiffs] damage." *Id.*

Mr. Landers' affidavit avers that he is "not involved in the day to day management of iPawn Arkansas, Inc." (Dkt. No. 44-5, ¶ 5). He further avers that the management of iPawn Arkansas "is conducted by the Chief Operating Officer and the store management" and that he does "not have and ha[s] not had an office" at iPawn Arkansas, nor does he regularly visit the pawn stores (*Id.*). He also states that he did not "set the rate of interest to be charged by iPawn Arkansas" and that he "did not set the Finance Charge at iPawn . . . Arkansas . . . ." (*Id.*, ¶¶ 6-7).

In response, plaintiffs present the bylaws of iPawn Arkansas (Dkt. No. 53-13). According to these bylaws, "[t]he President is currently the sole executive officer of the Corporation. As the principal executive officer of the Corporation, the President shall in general supervise and control all of the business and affairs of the corporation." (*Id.*, at 4). Mr. Landers admits that he is the president of iPawn Arkansas (Dkt. No. 53-12, at 2). Further, as Mr. Landers admits, he is the sole shareholder of iPawn Arkansas (Dkt. No. 44-5, ¶ 2).

Viewing the evidence in the light most favorable to plaintiffs and based on the language of Ark. Code Ann. § 4-88-113(d)(1) and the bylaws of iPawn Arkansas in this case, the Court

concludes that there are genuine issues of material fact in dispute as to whether Mr. Landers knew or should have known of the alleged violations by iPawn Arkansas, iPawn Rodney Parham, or iPawn Baseline. The Court denies summary judgment on plaintiffs' claims against Mr. Landers in his individual capacity.

### F.  TILA Claims

Counts Five and Six of the third amended complaint allege that iPawn Rodney Parham and iPawn Baseline violated 15 U.S.C. § 1638(a)(1) of the TILA by failing to disclose the identity of the creditors—namely, iPawn Rodney Parham and iPawn Baseline—on the pawn tickets (Dkt. No. 33, ¶¶ 114-119). Defendants argue they are entitled to summary judgment on the TILA claims because iPawn Rodney Parham and iPawn Baseline are not "creditors" and because plaintiffs have failed to demonstrate "detrimental reliance" upon the allegedly inadequate disclosures. The Court disagrees.

#### 1.  iPawn Rodney Parham And iPawn Baseline As "Creditors"

To prevail on their TILA claims, plaintiffs must prove that iPawn Rodney Parham and iPawn Baseline engaged in pawn transactions governed by the TILA and failed to place their names on the pawn tickets memorializing such pawn transactions. Plaintiffs must also show that these alleged failures are violations of § 1638(a)(1). Section 1638(a)(1) of the TILA requires that "[f]or each consumer credit transaction . . . the creditor shall disclose . . . the identity of the creditor required to make disclosure." The TILA defines a "creditor" as "a person who . . . regularly extends . . . consumer *credit* . . . ." 15 U.S.C. § 1602(g) (emphasis added). The TILA also defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f). The TILA's implementing regulation, Regulation Z, uses similar definitions for "creditor" and "credit." *See* 12 C.F.R. §§ 226.2(a)(14), 226.2(a)(17). Also,

per the Federal Reserve Board's Official Staff Commentary, the TILA governs certain pawn transactions:

> When, in connection with an extension of *credit*, a consumer pledges or sells an item to a pawnbroker creditor in return for a sum of money and retains the right to redeem the item for a greater sum (the redemption price) within a specified period of time, disclosures are required . . . .

12 C.F.R. Pt. 226, Supp. I, Subpt. C, at 12 C.F.R. § 226.17(c)(1) (emphasis added).

The TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payments." 15 U.S.C. § 1602(f); *accord* 12 C.F.R. § 1026.2(a)(14) ("Credit means the right to defer payment of debt or to incur debt and defer its payments.").[4] In *Yancy v. America's Preowned Selection LLC*, 658 Fed. App'x 824 (8th Cir. 2016) (unpublished per curiam), the Eighth Circuit discussed whether an "official fee" that was omitted from a TILA disclosure was "credit" under the TILA. The Eighth Circuit found that the fee was not credit under the TILA because the fee was paid at the time a down payment was also paid. 658 Fed. App'x at 827. In *Holbrook v. J.R.'s Auto Sales, Inc.*, Civil Action No. 2:15-cv-02081-JTF-cgc, 2016 WL 7362687 (W.D. Tenn. July 19, 2016), however, a district court found that a deferred down payment which created a discrepancy between two TILA disclosures was "credit" because the deferred down payment was due approximately a month *after* the sale was completed. 2016 WL 7362687, at *1.

---

[4] The Official Staff Commentary lists transactions that do not qualify as "credit" under the TILA. *See* 12 C.F.R. Pt. 226, Supp. I, at 12 C.F.R. § 226.2(a)(14) (listing transactions that "are not considered credit for purposes of the regulation . . . ."). Pawn transactions are not included in this list of excluded transactions. The list does include "[p]ayday loans," but it notes that "[a] fee charged in connection with a [payday loan] may be a finance charge . . . , regardless of how the fee is characterized under state law." 12 C.F.R. Pt. 226, Supp. I, at 12 C.F.R. § 226.2(a)(14)(2). If such a fee is charged and if "the person advancing funds regularly extends consumer credit, that person is a creditor . . . ." *Id.*

Defendants argue that iPawn Rodney Parham and iPawn Baseline are entitled to summary judgment on the TILA claims because the "undisputed facts are that iPawn Baseline . . . and iPawn Rodney Parham . . . are not engaged in the pawn business." (Dkt. No. 45, at 9). It is defendants' position that iPawn Arkansas is the only entity with whom plaintiffs conducted the pawn transactions (*Id.*). In support of this argument, defendants point to the pawn tickets attributable to plaintiffs and point out that "[i]Pawn Arkansas, Inc.'s name is clearly stated on all of the Plaintiffs' pawn ticket[s]." (*Id.*, at 8). Defendants also argue that the undisputed material facts show that plaintiffs cannot demonstrate detrimental reliance, which is a necessary element to prove a disclosure violation under the TILA (*Id.*, at 9). In response, plaintiffs point to the leases executed by iPawn Rodney Parham and iPawn Baseline, both of which state that leases are "for the operation of a business providing for pawn and loan services to consumers, as well as the retail sale of goods."

On the first question, the Court concludes that a genuine issue of material fact—whether the finance charges on plaintiffs' pawn transactions is "credit"—remains in dispute in this case. On the face of the pawn tickets attributable to plaintiffs, the finance charges are due a month after the pawn transaction occurs (*see* Dkt. Nos. 44-3, at 22-24; 44-4, at 19-20). Mr. Jones testified that he had returned to iPawn to receive an extension on his pawn (Dkt. No. 44-3, at 5). In Mr. Willingham's deposition, he testified that if pawn customers "choose to extend it out for 30 days, we make a profit on the pawn service charge." (Dkt. No. 53-28, at 5). This testimony, viewed in the light most favorable to plaintiffs, indicates that the finance charges are due *after* the pawn transaction initially occurs, which makes them more akin to the facts of *Holbrooke* than *Yancy*. Based upon these precedents and viewing the record evidence in the light most favorable to plaintiffs, the Court concludes that there are genuine issues of material fact in dispute regarding

whether the finance charges included in plaintiffs' pawn transactions qualify as "credit" under the TILA.

As to the second question—whether iPawn Rodney Parham and iPawn Baseline were involved in the pawn business—the Court concludes that there are still material issues in dispute. Mr. Willingham and Mr. Landers aver that neither of these entities are involved in the pawn business (Dkt. Nos. 44-1, ¶¶ 17-18; 44-4, ¶ 4). Mr. Willingham avers that these entities "were formed to enter into leases with the owner of the realty on which each of the iPawn Arkansas, Inc. stores were located." (Dkt. No. 44-1, ¶ 18). The leases for iPawn Rodney Parham and iPawn Baseline both state that "[t]he Premises shall be used for the operation of a business providing for pawn and loan services to consumers, as well as the retail sale of goods." (Dkt. Nos. 53-14, at 2; 53-15, at 2). Furthermore, Mr. Jones testified that he thought he was doing business with iPawn Baseline and "Rodney Parham" because he was at those locations (Dkt. No. 53-20, at 15). As to the pawn tickets attributable to Mr. Jones, one includes the Baseline address and the other two state the Rodney Parham address, though all three say "iPawn Arkansas, Inc." at the top (Dkt. No. 44-3, at 22-24). Both pawn tickets attributable to Mr. Powell have the Baseline address on them, and both pawn tickets also have "iPawn Arkansas, Inc." on the header (Dkt. No. 44-4, at 19-20). The Court is not swayed by the non-controlling authorities cited by defendants for the position that affiliated companies, officers, agents, and employees are not creditors under the TILA, especially given the record evidence before the Court (Dkt. No. 57, at 2-3). The record evidence cuts both ways, but viewing this evidence in the light most favorable to plaintiffs as the Court is required to do at this stage of the proceeding, the Court concludes that there remain genuine issues of material fact in dispute regarding whether iPawn Rodney Parham and iPawn Baseline qualify as "creditors"

under the TILA, engaged in pawn transactions governed by the TILA, and failed to place their names on the pawn tickets memorializing such pawn transactions.

## 2.    Detrimental Reliance

The final question is whether summary judgment is appropriate on the TILA claims because plaintiffs have failed to demonstrate detrimental reliance.  The Eighth Circuit has held that, to receive actual damages as a remedy for a disclosure violation under § 1638(a)(2), "a plaintiff must show that:  (1) he read the TILA disclosure statement; (2) he understood the charges being disclosed; (3) had the disclosure been accurate, he would have sought a lower price; and (4) he would have obtained a lower price."  *Peters v. Jim Lupient Oldsmobile Co.*, 220 F.3d 915 (8th Cir. 2000) (citation omitted).  In the *Peters* case, the Eighth Circuit affirmed the district court's grant of summary judgment against plaintiff because the "record reveals no evidence that [plaintiff] would have received a lower premium on the two insurance policies from any other insurance provider or that he suffered any actual damages."  220 F.3d at 917.  Since "the only remedy for a violation of § 1638(a)(2)(B)(iii) is actual damages and [plaintiff] cannot show any actual damages," the Eighth Circuit concluded that plaintiff's TILA claim failed.  *Id.*

According to defendants, plaintiffs "stated that they were not harmed" and have not demonstrated detrimental reliance (Dkt. No. 45, at 9).  Plaintiffs respond that they are entitled to declaratory relief under the TILA and that therefore detrimental reliance is not an element of their claims under the TILA (*see* Dkt. No. 45, at 34).  In reply, defendants argue that plaintiffs did not plead for declaratory relief in their operative complaint and that "requesting declaratory relief does not transform a legally deficient claim into a viable claim." (Dkt. No. 57, at 5).

First, the Court will address the pleading issue.  The Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, provides that, "[i]n a case of actual controversy within its jurisdiction . . . any

court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201(a). Plaintiffs did not ask specifically for any form of relief certain on any of their claims alleged in the third amended complaint (Dkt. No. 33), including but not limited to their TILA claims (Dkt. No. 33, at 18). Instead, plaintiffs requested relief in the last "wherefore" paragraph of their third amended complaint (Dkt. No. 33, at 19). Further, the operative complaint contains claims for declaratory relief under the state law usury claims (*Id.*). The Court concludes that the operative complaint is sufficient to put defendants on notice that plaintiffs were seeking a declaratory judgment regarding iPawn Rodney Parham and iPawn Baseline's obligations to disclose their identities on the pawn tickets. The operative complaint does not cite 28 U.S.C. § 2201, but it does contain claims for violations of the TILA by iPawn Rodney Parham and iPawn Baseline and a request for "[a]ny other relief this Court deems just and proper." (Dkt. No. 33, at 19). For these reasons, the Court concludes that, under federal pleading standards, the "appropriate pleading" has been filed for purposes of compliance with 28 U.S.C. § 2201 and defendants were on notice of a request for declaratory relief.

The Court next turns to the question of whether detrimental reliance is a required element where a plaintiff seeks declaratory relief for a violation of § 1638(a)(1). The *Peters* decision relied upon by defendants is inapposite because, as the Eighth Circuit recognized, the only remedy for the claims raised in that case—claims based upon § 1638(a)(2)—was actual damages, and the elements discussed in that case are directed at the proof necessary to demonstrate actual damages, not declaratory relief. 220 F.3d at 917. Neither party has directed the Court to authorities that state whether actual damages are the only available remedy for violations of § 1638(a)(1). Defendants cite to *Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008), and *Bolin v.*

*Sears, Roebuck & Co.*, 231 F.3d 970, 978-79 (5th Cir. 2000), two non-controlling cases, for the proposition that the TILA does not provide for declaratory relief, but these cases discuss whether certification under Federal Rule of Civil Procedure 23(b)(2) is appropriate based upon a request for declaratory relief; the Court does not understand these cases to stand for the proposition that declaratory relief is wholly unavailable for violations of § 1638(a)(1). Further, the Court can find no controlling authority on this issue as it relates to an alleged violation of § 1638(a)(1).

The Eighth Circuit has held that, even when a borrower cannot establish actual damages, lenders may be liable for technical or minor violations of the TILA because, for example, a proven violation of disclosure requirements is presumed to frustrate the Act's remedial purposes. *See Dryden v. Lou Budke's Arrow Finance Co.*, 661 F.2d 1186, 1191 (8th Cir. 1981). While plaintiffs do not appear to be seeking statutory damages for the alleged technical violations of the TILA, nothing in the authorities reviewed by this Court suggests that plaintiffs cannot seek declaratory relief based upon the same alleged technical violations. Accordingly, the Court declines to grant summary judgment to defendants on plaintiffs' TILA claims due to plaintiffs' alleged failure to demonstrate detrimental reliance.

## IV. Conclusion

For the foregoing reasons, the Court denies defendants' motion for summary judgment (Dkt. No. 44).

It is so ordered, this the 5th day of March, 2019.

Kristine G. Baker
United States District Court Judge